**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | | |
|---|---|---|
| CHRISTINE SERENI-MASSINGER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. _____ |
| | ) | |
| v. | ) | |
| | ) | **Demand for Jury Trial** |
| SAINT LEO UNIVERSITY | ) | |
| INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## COMPLAINT

Plaintiff, CHRISTINE SERENI-MASSINGER ("Professor Sereni-Massinger" or "Prof. Sereni-Massinger), by and through her undersigned attorneys, brings this COMPLAINT against the Defendant, SAINT LEO UNIVERSITY INCORPORATED ("University"), and in support thereof, alleges as follows:

### STATEMENT OF THE CASE

1.      This is an action for (1) retaliation prohibited by the Civil Rights Act of 1964, Title VII, 42 U.S.C. §§ 2000e, *et seq*., (2) breach of contract, (3) breach of duty of good faith and fair dealing, and (4) promissory estoppel each stemming from complaints filed by Professor Sereni-Massinger with Human Resources ("HR") against: (a) Toni Winn ("Winn") for creating a hostile work environment and (b) Susan Kinsella ("Kinsella"), the then Dean of School of Education and Social Services, who concealed from HR Winn's conduct and Professor Sereni-

Massinger's subsequent complaint. HR failed and refused to conduct a bona fide investigation of the complaint against Kinsella. As a consequence of the complaints to HR, the University demoted Prof. Sereni-Massinger and ultimately terminated her employment under the guise of a reduction in force. The termination was wrongful in that it was both retaliatory and a breach of Prof. Sereni-Massinger's contractual rights as a tenured Associate Professor.

2.     Beginning on or about August 1, 2016, Prof. Sereni-Massinger, a tenured professor in the Criminal Justice Department, was subjected to a hostile work environment based on sex and religion.

3.     Winn, a female employee assigned to perform administrative tasks for Prof. Sereni-Massinger, regularly subjected her to harassing comments. The nature of Winn's comments was (1) the insufficiency of Prof. Sereni-Massinger's Christian observance or beliefs and (2) her disdain toward Prof. Sereni-Massinger because she was a woman. Winn intentionally interfered with Prof. Sereni-Massinger's ability to do her job by ignoring her requests and refusing to perform tasks assigned to her.

4.     After Prof. Sereni-Massinger complained to Kinsella, Kinsella concealed the complaint from HR. After Prof. Sereni-Massinger discovered the concealment and spoke to HR, the University demoted Prof. Sereni-Massinger.

5.     The University's retaliation culminated in a notice of termination to Prof. Sereni-Massinger on February 16, 2023. Prof. Sereni-Massinger's last day of employment was June 30, 2023.

6.     Prof. Sereni-Massinger seeks all damages available to remedy the breach and unlawful retaliation and to deter the University from deliberately violating federal law, including but not limited to compensatory damages, expectancy damages, attorneys' fees and costs, declaratory and equitable relief, and punitive damages.

## JURISDICTION AND VENUE

7.      This court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.

8.     This court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiff's breach of contract and other state law claims because the claims are so related to the action within the Court's original jurisdiction that the alleged causes of action form part of the same case or controversy.

9.     Venue is proper pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to Plaintiff's claims occurred in this Court's judicial district and Defendant's principal place of business is in this Court's jurisdiction.

## PARTIES

10.     Prof. Sereni-Massinger was an employee as defined by 42 U.S.C. § 2000e(f).

11.     Prof. Sereni-Massinger is a non-traditional Christian, woman residing in Ocala, Florida.

12.     The University is an employer as defined by 42 U.S.C. § 2000e(b).

13. The University is a non-profit educational institution with its main campus located in St. Leo, Florida.

## PROCEDURAL BACKGROUND

14. Prof. Sereni-Massinger exhausted her administrative remedies at the Equal Employment Opportunity Commission ("EEOC").

15. On May 19, 2023, Prof. Sereni-Massinger received a Notice of Right to Sue, attached as Exhibit A.

16. This complaint is being filed within 90 days of Prof. Sereni-Massinger's receipt of the EEOC Notice of Right to Sue.

17. All other conditions precedent relevant to Prof. Sereni-Massinger's claims alleged herein have been satisfied.

## ALLEGATIONS OF FACT COMMON TO ALL COUNTS

### Prof. Sereni-Massinger's Rise Through the Ranks

#### *Adjunct Teacher*

18. Prof. Sereni-Massinger began working at the University in 2009 as an adjunct (part-time) faculty member teaching in the undergraduate program of the Criminal Justice Department.

#### *Elevated to Full-Time Associate Professor - Undergraduate*

19. In 2012, Prof. Sereni-Massinger was hired as full-time, non-tenure track faculty in the Criminal Justice Department under the umbrella of the University's School of Education and Social Services. At that time, students could enroll in the Criminal Justice Department undergraduate program through the

4

Gainesville, Lake City, and Ocala Education Centers. At the time of her hire, the University had multiple Education Centers (i.e., satellite teaching facilities) in several states, including Florida, that primarily catered to adult learners by offering flexible, hybrid learning options (i.e., in-person courses and on-line courses).

### Lead Faculty Appointment

20.    In or around May 2014, the then Chair of the Department of Criminal Justice of the University was so impressed with Prof. Sereni-Massinger that she was offered the position of Lead Faculty primarily responsible for observing her peers teach classes and making suggestions to improve their skills, as well as other duties determined by the Department Chair and Dean.

### Elevated to Associate Chair of
### Undergraduate Criminal Justice Department

21.    By in or around July 2014, the then Dean of the School of Education and Social Services was so impressed with Prof. Sereni-Massinger's teaching performance and leadership capabilities that Prof. Sereni-Massinger was selected to serve as the Associate Chair of the Criminal Justice undergraduate program, sharing responsibility for the management and supervision of the program.

22.    In or around May 2015, Prof. Sereni-Massinger was hand-picked by the President of the University to participate in the University's prestigious *Leadership Saint Leo* program, a one-year program designed to foster leadership skills and groom participants for roles within the University administration.

### *Elevated to Regional Academic Director for the State of Florida*

23.    Beginning July 1, 2015, on recommendation of the then Dean of the School of Education and Social Services, Prof. Sereni-Massinger was appointed by the then Vice President of Academic Affairs to the administrative role of Regional Academic Director, responsible for the supervision and mentorship of all Center faculty within the State of Florida, in addition to maintaining her teaching duties as an Associate Professor in the undergraduate program.

### *Teaching Award*

24.    In or around July of 2015, the University recognized Prof. Sereni-Massinger's excellence in teaching by awarding her the prestigious *Faculty Recognition A*ward.

### *Elevated to Teaching in Graduate Criminal Justice*

25.    At the same time in 2015, the then Dean of the School of Education and Social Services offered Prof. Sereni-Massinger a faculty position in the graduate program of the Criminal Justice Department, which she accepted. The graduate Criminal Justice program was under the umbrella of the Public Safety Administration on the University's main campus.  In this new role, Prof. Sereni-Massinger was provided an office on the main campus and was responsible for teaching graduate students in the *Masters in Criminal Justice – Legal Studies* degree program. By accepting this appointment, Prof. Sereni-Massinger became main campus faculty and participated in University governance as main campus faculty. It also carried with it the opportunity to seek tenure, an option generally

discouraged of faculty who did not teach on main campus such as those who worked at the University's satellite "Education Centers."

26.    Prof. Sereni-Massinger was reappointed to the above roles on May 3, 2016.

### *Promoted to Associate Dean*

27.    By July of 2016, the University was so impressed with Prof. Sereni-Massinger that it offered her an appointment to the prestigious administrative role of Associate Dean of the School of Education and Social Services.

28.    Prof. Sereni-Massinger's appointment to Associate Dean was made by the then Vice President of Academic Affairs and approved by the University's then President.

29.    On July 28, 2016, Prof. Sereni-Massinger received a 12-month appointment contract to the position of Associate Dean. The Associate Dean Appointment Contract provided that Prof. Sereni-Massinger retained her faculty appointment status as a tenure track, Associate Professor in the Criminal Justice Department at the University. A true and correct copy of the Associate Dean Appointment Contract is attached hereto and incorporated herein as Exhibit B (the "Assoc. Dean Appointment Contract").

30.    While an Associate Dean, Prof. Sereni-Massinger also maintained her main campus teaching assignment in the Criminal Justice Department where she continued to teach the *Masters in Criminal Justice – Legal Studies* program.

### **Tenure and the Tenure Contract**

31.   At or around the time of Prof. Sereni-Massinger's appointment to the main campus graduate program in Criminal Justice in 2015, the then Dean of the School of Education and Social Services encouraged her to convert her faculty appointment status from non-tenure track to tenure track.

32.   At the time, promotion and tenure were the means by which the University recognized individual faculty for excellence in their faculty role. Those awarded promotion received salary increases; those awarded tenure received all the rights of tenure.

### *Tenure Requirements and Risks*

33.   The tenure application process was rigorous and occured over the course of a maximum of six years during which time the faculty member was considered "on probation."

34.   Tenure decisions were made very judiciously and on the basis of documented and evaluated performance in three areas: teaching; professional development (including research and scholarly growth); and institutional and community service.  For teaching faculty, excellence in teaching and demonstrated student learning were essential to tenure and promotion. Either professional development through research and scholarly growth or institutional and community service were required to be judged excellent for tenure.

35.   By way of process, very generally, tenure track faculty were required to apply for tenure by presenting an application portfolio evidencing their performance in each of the above areas.  Department Chairs, Directors, and Deans

8

provided a Promotion and Tenure Committee with written evaluations and recommendations for tenure. Recommendations were presented to the President who made the decision whether to grant or deny tenure. Awards of tenure were ratified by the Board of Trustees.

36.    Seeking tenure was also not without risk. Faculty on tenure track were required to apply for tenure within six years. The University, in fact, dismissed tenure track faculty who failed to timely apply for tenure by their sixth year. Likewise, if tenure was not granted in the sixth year, faculty were non-renewed at the end of their seventh year (the "terminal year") i.e., loss of employment.

### Inducement - The University's Tenure Promise

37.    The University published its policies concerning tenure in the Saint Leo University Policy Manual. A true and correct copy of the then Saint Leo University Policy Manual – All Volumes, Governance and Administration dated February 2008 is attached hereto and incorporated herein by reference as Exhibit C ("Policy Manual").

38.   Volume IV of the Policy Manual, entitled, "Faculty Personnel Policies," was "incorporated by reference into the appointment contracts of each faculty member."

39.   According to the Faculty Personnel Policies, tenure track appointments and tenure appointments were governed by the terms of the "Faculty Collective Bargaining Agreement" ("CBA"). Volume IV-A of the University Policy Manual included the 2008 version of the CBA which was amended on June 6, 2013

9

and approved by the University Board of Trustees through August 15, 2016.  A true and correct copy of the 2013 Faculty Collective Bargaining Agreement is attached hereto and incorporated herein by reference as Exhibit D ("2013 CBA").

40.    According to University policy and the appointment contracts of each faculty member, including those of Prof. Sereni-Massinger, once tenure became effective, tenured faculty were guaranteed "continuous employment for each successive year until retirement or until the faculty member was terminated for just cause or reduction in force."  A tenured faculty member's employment was no longer considered at-will employment.

41.    Moreover, according to University policy and Prof. Sereni-Massinger's appointment contract, the justification for a reduction in force was limited to "man-made and natural disasters, acts of God, program termination and financial exigency." Even if a reduction in force was justified, **tenured faculty were promised to be granted preference in retention over non-tenured faculty**. (See Exhibit D)(emphasis added).

42.    After careful consideration of both the rigors and risks associated with seeking tenure and the University's promise of job security, Prof. Sereni-Massinger accepted the challenge of seeking tenure. On July 8, 2016, upon recommendation of the then Dean for the School of Education and Social Services, the status of Prof. Sereni-Massinger's faculty appointment was officially changed from non-tenure track to tenure track by the then Vice President of Academic Affairs.  A true and correct copy of the "Appointment Status Change" contract between the University

and Prof. Sereni-Massinger is attached hereto and incorporated by reference as Exhibit E (the "Tenure Track Contract").

43.    By reference therein, the University Policy Manual, faculty personnel policies, and portions of the 2013 CBA were incorporated into the Tenure Track Contract.  The Tenure Track Contract also expressly incorporated by reference the terms of the University's Faculty Handbook, Employee Handbook[1], and other "University policies and procedures."  A true and correct copy of the then Faculty Handbook (rev. January 2014) is attached hereto and incorporated by reference as Exhibit F.

44.    The Tenure Track Contract made Prof. Sereni-Massinger's tenure track retroactive to the start date of her original full-time employment thus requiring her to meet the University's tenure expectations in an extraordinarily short period of time versus the six years normally afforded other faculty. After expending extraordinary time, effort, and energy required to meet the University's tenure standards and follow its application protocol, Prof. Sereni-Massinger submitted her formal application for tenure in the Fall of 2016.

45.    The University exploited Prof. Sereni-Massinger's extraordinary efforts to obtain tenure to its great benefit.

### *Award of Tenure*

46.    On February 3, 2017, the University granted Prof. Sereni-Massinger tenure.

---

[1] Contained in the University Policy Manual

47.    The University's decision to grant Prof. Sereni-Massinger tenure and the rights attendant therewith was recommended by the President and ratified by the highest level of authority in the University, namely its Board of Trustees.

## Hostile Work Environment and Report of Discrimination to HR

48.    Kinsella, as the Dean of the School of Education and Social Services, was Prof. Sereni-Massinger's direct supervisor when she was the Associate Dean.

49.    Prof. Sereni-Massinger took seriously her role as Associate Dean and, given her experience as both an attorney and former Judge in the Commonwealth of Pennsylvania, was particularly knowledgeable in the areas of Title VII violations including discriminatory behavior and hostile work environments.  In fact, both were subjects covered in various courses Prof. Sereni-Massinger taught over the decades at several colleges and universities including Saint Leo University.

50.    Commencing almost immediately upon her assuming the role of Associate Dean on August 1, 2016, Prof. Sereni-Massinger was subjected to a hostile work environment at the hand of Winn, Executive Coordinator in the School of Education and Social Services, whose repeated acts of insubordination and discrimination were condoned by Kinsella.

51.    Winn's discriminatory behavior was based primarily on sex and religion, and her acts of insubordination were frequent. For example, Winn rebuked Prof. Sereni-Massinger when she changed an invitation Winn created from the words "Christmas Party" to "Holiday Party" telling Prof. Sereni-Massinger that she was taking "Christ" out of Christmas and therefore was not a

good Christian. Winn was insubordinate to Prof. Sereni-Massinger, ignoring her requests and refusing to perform duties for her. Winn stated that the prior Associate Dean was a man, and she did not like working for women. Winn refused to pronounce Prof. Sereni-Massinger's hyphenated last name, claiming it was inconvenient and declaring her preference against the use of hyphenated names. She elaborated that women should take their husbands' last names.

52.    On or about January 18, 2017, Prof. Sereni-Massinger brought Winn's behavior to the attention of Kinsella, informing her that since August 1, 2016, Winn was engaged in a pattern of making discriminatory remarks to Professor Sereni-Massinger. These remarks were based on sex and religion. Kinsella responded by telling Prof. Sereni-Massinger not to make a complaint to HR about Winn and that she would handle the problem directly.

53.    That same day, a meeting was scheduled by Kinsella for the purpose of addressing Winn's behavior.  Prior to the meeting, Kinsella suggested that Prof. Sereni-Massinger be firm and instructed her to "take Toni [Winn] on" as she would a "bully horse." The meeting held on January 26, 2017, was led by Kinsella, lasted nearly an hour, and was spent discussing ordinary administrative items. In the last two minutes of the meeting, Kinsella remarked something to the effect of "now I understand you two aren't getting along." Subsequent to the meeting, Kinsella informed Prof. Sereni-Massinger that Winn would no longer be the executive coordinator to both her and Kinsella. Instead, Winn assisted only Kinsella.  This

13

left Prof. Sereni-Massinger without an executive coordinator in her role as Associate Dean.

54.    In the months that followed, Winn continued to be insubordinate and make harassing comments to Prof. Sereni-Massinger. When this conduct was brought to the attention of Kinsella, not only did Kinsella fail to discipline Winn, she continued to condone and minimize Winn's on-going behavior, citing Winn's personal problems as an excuse.  Kinsella stated to Prof. Sereni-Massinger, at least six times after she complained about Winn, that Prof. Sereni-Massinger was "fragile," "too fragile," and "so fragile." Kinsella also stated to Prof. Sereni-Massinger that it was a good thing she never became a mother.

55.    On or about May 6, 2017, Kinsella informed Prof. Sereni-Massinger that Winn was "causing me (Kinsella) problems now." Kinsella told Prof. Sereni-Massinger that Winn told Joseph Tadeo, the Director of Academic Administration, that Kinsella was rarely in her office at the main campus. Kinsella told Prof. Sereni-Massinger that she was "right all along about Toni [Winn]," and requested that Prof. Sereni-Massinger provide her with a summary of the acts of discrimination committed by Winn so that she could take it to HR. Kinsella instructed Prof. Sereni-Massinger not to send the complaint to Kinsella's University e-mail address, but to a personal, non-University e-mail address belonging to her husband.  Prof. Sereni-Massinger sent the complaint to Kinsella, as directed, who acknowledged its receipt.

56.   Kinsella subsequently confirmed that she filed the complaint with HR. Thereafter, when Prof. Sereni-Massinger would inquire from time-to-time about the status of HR's investigation, Kinsella said that HR was taking it seriously and looking into it.

57.   Kinsella told Prof. Sereni-Massinger that if she wanted an administrator role, she would have to get along with Winn.

58.   By July of 2017, hearing nothing from HR about the complaint, Winn's behavior continuing to go unchecked, and not wanting to be a part of an administration that condoned such behavior, Prof. Sereni-Massinger considered resigning from her role as Associate Dean, finding her current role untenable under the circumstances.  She brought the details of the situation concerning Winn to the attention of the Executive Director of Academic Administration at a sit-down meeting.  The Executive Director was empathetic and confided that he too was the recipient of a discriminatory comment made by Winn based on sexual preference.

59.   On July 17, 2017, Prof. Sereni-Massinger met with HR to inquire what her base pay would be as Associate Professor if she resigned as Associate Dean. When the HR representative asked why she was considering resigning, Prof. Sereni-Massinger responded that it was because of the unresolved complaint against Winn that she was led to believe would be submitted to HR. Prof. Sereni-Massinger was informed that HR had no record of a complaint about Winn being submitted by Kinsella or anyone else. The representative requested that Prof. Sereni-Massinger provide HR with a copy of the complaint and seemed

particularly concerned about Kinsella's failure to report the incidents. Prof. Sereni-Massinger complied with the request. It was at this time that Prof. Sereni-Massinger realized Kinsella had intentionally concealed the harassment and discrimination complaint from HR.

### Retaliation - Demotion

60.   Upon Prof. Sereni-Massinger's return from HR on July 17, 2017, Kinsella asked her where she had been. When Prof. Sereni-Massinger responded that she had been in HR, Kinsella asked whether her name had been mentioned at the meeting to which Prof. Sereni-Massinger responded in the affirmative. Hours later, Kinsella informed Prof. Sereni-Massinger that she should voluntarily resign as Associate Dean and return to her full-time teaching role.

61.   Kinsella's intent to force out Prof. Sereni-Massinger as Associate Dean continued at least through September 2017. Kinsella often informed Prof. Sereni-Massinger that she need not come to her office at main campus and could work from the Ocala Center.

62.   On July 25, 2017, concerned by Kinsella's intent to remove her from her administrative role, Prof. Sereni-Massinger e-mailed then-Vice President Bob Quinn ("Quinn") about her HR complaint of harassment and discrimination by Winn and the hostile work environment created by both Winn and Kinsella.

63.   Prof. Sereni-Massinger scheduled a meeting with HR on September 25, 2017 to follow up on the complaint.  In anticipation of the meeting, Prof. Sereni-

Massinger provided HR with an updated report of events pertaining to the actions of Winn and Kinsella.

64.     At the meeting, HR informed Prof. Sereni-Massinger that her discrimination complaint against Winn was dismissed and no action would be taken against her. HR reported that the investigation of Kinsella was "on-going" and thanked her for the additional information. Since 2017, HR never communicated the results of the purported investigation of Kinsella to Prof. Sereni-Massinger.

65.     Upon information and belief, the University failed to investigate Prof. Sereni-Massinger's hostile work environment complaint against Kinsella.  Instead, they left her to fend for herself with a hostile supervisor who wanted her to resign. Thereafter, Kinsella remained Prof. Sereni-Massinger's supervisor as a faculty member.

66.     In November 2017, Prof. Sereni-Massinger met with Mary Spoto ("Spoto"), Vice President of Academic Affairs, and informed her of the HR complaints about Winn's discrimination, Kinsella's acquiescence and concealment from HR, and the hostile work environment created by both Winn and Kinsella. In response, Spoto's demeanor changed, and she became angry demanding to know who else knew about the complaint. As a solution, Spoto merely offered to mentor Kinsella. Prof. Sereni-Massinger later learned of Spoto and Kinsella's close friendship with one another.

67.  In or around November of 2017, with HR's opinion that the allegations against Winn were unfounded (which only emboldened her), no executive coordinator to support her, Kinsella wanting her out as Associate Dean, and no intervention by HR or end in sight to the hostile work environment she was forced to endure on a daily basis, Prof. Sereni-Massinger considered stepping down as Associate Dean and inquired about the conditions of her employment if she stepped down.

68.  Upon inquiry into her employment status if she resigned as Associate Dean, Prof. Sereni-Massinger made clear that her decision was conditioned upon verification of Prof. Sereni-Massinger's adjusted salary when she returned to her former role teaching full-time in the graduate program of the Criminal Justice Department on the main campus.

69.  On December 6, 2017, Spoto notified Prof. Sereni-Massinger that her "resignation" was accepted immediately even though she had not yet resigned. At that time, Spoto failed to confirm Prof. Sereni-Massinger's salary and appointment.

70.  Spoto responded to Prof. Sereni-Massinger's inquiry with a reappointment letter inexplicably assigning Prof. Sereni-Massinger to an undergraduate faculty position teaching students at the Gainesville, Lake City, and Ocala Centers, a location that marginalized her from main campus, its faculty, and other employees.  A position at the Centers would require, inter alia, that Prof. Sereni-Massinger be on 10-month contract as opposed to the 9-month contract

18

and carry a course load of 9 courses versus 6 courses, both conditions of other graduate level faculty. At the Centers, she also would be ineligible for the benefits afforded main campus faculty including union membership and University governance for main campus faculty, and she would not be able to teach online in the graduate program where she had taught since 2015. Spoto provided a one-week deadline, until December 16, 2017, for Prof. Sereni-Massinger to agree.

71.    Prof. Sereni-Massinger promptly objected to the written appointment letter that placed her teaching undergraduate students at the Centers because it did not comply with the terms of her Assoc. Dean Appointment Contract which provided that, upon completion of her appointment as Associate Dean she would "return to her former role," which was Associate Professor in the graduate program in the Criminal Justice Department located at the main campus where she had been assigned to teach since 2015.

72.    Fearing that if she did not have a signed reappointment letter before the University closed for the holiday, she would not have a position to return to on January 2, 2018, the beginning of the spring term, Prof. Sereni-Massinger, under considerable duress, signed the appointment letter under the condition that she be reappointed to her role as Associate Professor in the graduate program of the Criminal Justice Department where she would continue to teach all courses on-line.

73.    Spoto issued Prof. Sereni-Massinger a revised reappointment agreement which, per her request and contractual right, returned her to teach in

the graduate program under the supervision of the Graduate Director on the main campus.  A true and correct copy of the reappointment letter dated December 15, 2017, is attached hereto and incorporated by reference as Exhibit G (the "2017 Reappointment Contract"). Like all faculty appointment contracts, according to the University Policy Manual, the Faculty Personnel Policies and portions of the 2013 CBA were incorporated into the 2017 Reappointment Contract. The 2017 Reappointment Contract also expressly incorporated by reference the terms of the University's Faculty Handbook, Employee Handbook, and other "University policies and procedures." Beginning on January 2, 2018, Prof. Sereni-Massinger resumed her role as faculty in the graduate program of the Criminal Justice Department.  All courses taught by Prof. Sereni-Massinger were graduate courses taught online and not the Centers. Students could not even enroll in the graduate program through the Centers.

74.    With Kinsella as her supervisor and the person responsible for making recommendations regarding administrative appointments, after January 2, 2018, the University never offered Prof. Sereni-Massinger another administrator role or requested that she apply for one.

75.    The loss of the Associate Dean administrative position resulted in a loss of yearly salary in the amount of $38,000.

### Retaliation - Termination

76.    On or about February 16, 2023, the University announced that it was closing eight of its Education Centers and discontinuing, inter alia, three of its

20

programs. The University informed Prof. Sereni-Massinger that her last day of employment was June 30, 2023, purportedly because her position had been eliminated, thus depriving her of the University's promised continuous employment and the salary and benefits associated therewith until her voluntary retirement.

77.    On or about February 16, 2023, the University offered Prof. Sereni-Massinger a non-negotiable severance agreement.

78.    The agreement included an unlawful release of Prof. Sereni-Massinger's statutory right to file a charge with any local, state, or federal agency, specifically, including the EEOC and FCHR. She did not sign the agreement.

79.    Prof. Sereni-Massinger's last day of employment was June 30, 2023.

80.    To date, Prof. Sereni-Massinger has been unable to secure comparable employment after diligent attempts.

***University's Pretextual and Shifting Reasons for Termination***

81.    According to the University's contract with Prof. Sereni-Massinger, the only lawful bases for her termination were for (1) just cause, or (2) a reduction in force, the latter of which must be necessitated by either a man-made or natural disaster, an act of God, a program termination or financial exigency.

82.    Prof. Sereni-Massinger's termination was improper in that it was not based on any of the foregoing permitted bases.

83.    To the contrary, in a February 16, 2023 letter to Prof. Sereni-Massinger, the University stated that the basis for her termination was that "*[the*

University] is restructuring in an effort to remain competitive in a challenging market and economy to better serve our students" and that the University was "implement[ing] several changes to its operations and structure to maximize resources, realign departments, reduce duplication, and streamline operations." It went on to explain, "[t]he decision to discontinue degree programs was made after conducting an audit of enrollment trends and forecasting **future market needs**." (emphasis added).

84.    Although the University discontinued three of its degree programs, the program in which Prof. Sereni-Massinger taught on an exclusive basis since 2015, namely the Masters in Criminal Justice program, was not discontinued.  In fact, no Criminal Justice degree programs were discontinued.  To the contrary, the University reported that Criminal Justice was the most popular major for the Class of 2023.

85.    Nor was Prof. Sereni-Massinger's termination based on financial exigency. To the contrary, on the day Prof. Sereni-Massinger was notified of her termination, in an e-mail to all faculty and staff, the University President stated that "[w]hile we have made great progress toward ensuring a strong financial standing, today it was necessary to take additional steps to position our university **for future success**." (emphasis added).  Future success, by its terms, is not a current financial exigency.

86.    Not only was the University not in a state of financial exigency, it was arguably growing.  At the same time the University decided to close three programs

and eight of its education centers, it was busy creating several new programs based on its "*forecasting [of] future market needs*," buying autonomous vehicles to shuttle students around campus and constructing a new 20-million-dollar Wellness Center, for instance. In an announcement on the date Prof. Sereni-Massinger was notified of her termination, Spoto confirmed that the closure of programs and centers was "*prompted by financial **forecasting***" and part of a "*reorganization*" having a goal of "***the creation of new programs***…" (emphasis added).

87.    Upon information and belief, at the same time the University was carrying out a so-called reduction in force, it was hiring new faculty and employees for newly created programs and replacing terminated tenured faculty with part-time adjunct faculty.

88.    On or about February 16, 2023, Prof. Sereni-Massinger notified Spoto that she should not have been included in the reduction in force because neither the undergraduate nor graduate Criminal Justice programs were impacted by low enrollment or financial exigency.

89.    In response, Spoto stated that Prof. Sereni-Massinger's position was eliminated because it was "associated with" the Ocala Center which was being closed.

90.    At no time prior to Prof. Sereni-Massinger's decision to undertake the rigors of seeking tenure (converting her faculty status to "tenure track") did the University inform Prof. Sereni-Massinger, verbally or in writing, directly or

indirectly, including but not limited to, through any published University policy, that her tenure was "associated with" or otherwise limited to a physical location such as a Center.   To the contrary, tenure was a guarantee of continued employment with the University subject to very limited exceptions, the closure of a Center not being one of them. Moreover, all faculty appointment agreements had as the locus of their appointment the **Department** of the University as stated in the appointment contract. (emphasis added).

91.   Upon information and belief, at the time Spoto prepared the Reappointment Contract, as University Vice President, she was aware that the University was contemplating closure of several of the Education Centers, including the Ocala, Gainesville, and Lake City Centers, and that in so doing the University intended to terminate all personnel "associated with" them, including tenured faculty.

92.   Upon further information and belief, armed with this knowledge and information, Spoto attempted to associate Prof. Sereni-Massinger with the Centers with the specific intent to terminate her when the Centers closed.

93.   On April 13, 2023, Prof. Sereni-Massinger sent a detailed letter to University President, Ed Dadez ("Dadez"), informing him, inter alia, that she had not worked at any Center since 2015, she taught exclusively in the Criminal Justice graduate program offered only on-line, she had no students or advisees at the Centers, she had no office at the Centers and received no mail at the Centers, and most importantly, she was paid not from a Center budget, but from the Masters in

Criminal Justice program budget. She further informed Dadez of the University's failure to accord her preference over non-tenured faculty in the reduction in force. She also described to the President the pattern of discrimination and retaliation she endured and the connection between such pattern and the decision to terminate her.

94.    In response to Prof. Sereni-Massinger's April 13, 2023 letter, Dadez stated that the decision to terminate her was "financial," despite the fact that the University's business records accurately reflected that between 2015 and 2023, Prof. Sereni-Massinger was appointed as a tenured Associate Professor in Graduate Studies in the Criminal Justice Department and that her salary was not paid from a Center budget, but rather from the Masters in Criminal Justice budget.

95.    At no time did the University inform Prof. Sereni-Massinger that her termination was based on financial exigency.

### University Ignored Its Tenure Obligations

96.    The University failed to follow its own policy and contractual obligation to Prof. Sereni-Massinger by failing to give her preference over non-tenured faculty in its purported reduction of force.

97.    Prof. Sereni-Massinger was the only instructional faculty in the entire Department of Criminal Justice, including both the undergraduate and graduate programs, who the University terminated.

98.    Four non-tenured and lower ranked faculty (Associate Professors outranked Assistant Professors) with less University seniority than Prof. Sereni-

Massinger were retained in the Criminal Justice Department.  In fact, everyone in the Criminal Justice Department was retained except Prof. Sereni-Massinger.

99.   Upon information and belief, other faculty members who had filed complaints with HR during their employment were also terminated despite not working at a Center and not teaching in a program that was eliminated.

100.   Upon information and belief, other than the aforementioned faculty members, Prof. Sereni-Massinger was the only instructional faculty who was terminated despite not teaching in a program that was eliminated or being compensated out of a non-Center budget.

101.   It was no secret that the University's upper administration and Board of Trustees were generally hostile to tenured faculty positions because it was more profitable to employ adjuncts on a part-time basis. As one Board member remarked to Prof. Sereni-Massinger on or about the time she was appointed as Associate Dean, every grant of tenure means a million-dollar commitment by the University. Upon information and belief, having tenured faculty was, in the University's view, a necessary evil to qualify for continued university accreditation.

102.   Two weeks after receiving notice of her termination, the University advertised an adjunct faculty position in the Department of Criminal Justice. One of the required minimum qualifications for the position was a law degree (Juris Doctor).  Prof. Sereni-Massinger held a Juris Doctor degree.

103.   After she was terminated on February 16, 2023, Prof. Sereni-Massinger learned for the first time that she had been disciplined by the University

26

with a demotion, as opposed to voluntarily relinquishing her administrative role as Associate Dean in favor of a non-administrative bargaining unit faculty position. The demotion was made part of her permanent personnel file with HR. Prof. Sereni-Massinger was never notified that she had been disciplined.

## COUNT I

## Title VII – Retaliation

104. Plaintiff re-alleges and incorporates paragraphs 1-103 herein.

105. Prof. Sereni-Massinger complained about discrimination and harassment based on sex and religion to multiple University administrators and Human Resources.

106. The University demoted Prof. Sereni-Massinger and ultimately terminated her.

107. The demotion and termination are inextricably linked and causally related to Prof. Sereni-Massinger's complaints of discrimination and harassment.

108. The University's failure to notify Prof. Sereni-Massinger that she had been demoted, Spoto's inaccurate representation of Prof. Sereni-Massinger as a Center employee, and the University's termination of her employment for pretextual reasons, identified herein, support that the University's actions were intentional to retaliate against Prof. Sereni-Massinger in violation of the Civil Rights Act of 1964, 42 U.S.C § 2000e-3.

109. The University's reasons for termination were pretext for unlawful retaliation.

## COUNT II

## Breach of Written Contract

110.   Plaintiff re-alleges and incorporates paragraphs 1-103 herein.

111.   This is a claim for breach of the written agreement between the University and Prof. Sereni-Massinger as embodied in the 2016 Appointment Contract, the Tenure Track Contract, the Tenure Grant, all documents made a part of the foregoing, namely the Faculty Handbook (rev. January 2014), the 2013 CBA, the University Policy Manual, as well as all subsequent amendments to the foregoing as mutually agreed to by both the University and Prof. Sereni-Massinger in writing.

112.   The University owed Prof. Sereni-Massinger the contractual duties in the 2016 Appointment Contract, including, without limitation, a duty of continued employment until her retirement unless she was terminated for just cause or a reduction in force necessitated by either a man-made or natural disaster, an act of God, a program termination or financial exigency.

113.   Continued employment was a material term of the written agreement and the very essence of the Tenure Track Contract.

114.   In the event of a reduction in force based on bona fide financial exigency, the University owed Prof. Sereni-Massinger the duty to retain her employment over non-tenured faculty.

115.   The duty set forth in the preceding paragraph was a material term of the written agreement and the very essence of the Tenure Track Contract.

28

116.   The University materially breached those duties by:

    a.   terminating Prof. Sereni-Massinger without cause and without a reduction in force necessitated by either a man-made or natural disaster, an act of God, a program termination or financial exigency;

    b.   failing to retain Prof. Sereni-Massinger's employment over non-tenured faculty as part of its reduction in force; and

    c.   failing to act in good faith.

117.   As a result of the above breaches, Prof. Sereni-Massinger has sustained and incurred, and continues to sustain and incur, damages in an amount in excess of $1,000,000 to be determined at trial.

118.   All material conditions for the University's performance under the above written agreement between the University and Prof. Sereni-Massinger occurred.

## COUNT III

## Breach of Implied Covenant of Good Faith and Fair Dealing

119.   Plaintiff re-alleges and incorporates paragraphs 1-103 herein as if set forth in their entirety.

120.   This is a claim for the University's breach of its covenant of good faith and fair dealing implied in the written agreement between the University and Prof. Sereni-Massinger as embodied in the 2016 Appointment Contract, the Tenure Track Contract, the Tenure Grant, all documents made a part of the foregoing,

namely the Faculty Handbook (rev. January 2014), the 2013 CBA, the University Policy Manual, as well as all subsequent amendments to the foregoing as mutually agreed by both the University and Prof. Sereni-Massinger in writing.

121.   The University owed Prof. Sereni-Massinger the express contractual duties in the above written agreement, including, without limitation, a duty of continued employment until her retirement unless she was terminated for just cause or a reduction in force necessitated by either a man-made or natural disaster, an act of God, a program termination or financial exigency.

122.   The duty set forth in the preceding paragraph was a material term of the written agreement and the very essence of the Tenure Track Contract.

123.   In the event of a reduction in force based on bona fide financial exigency, the University owed Prof. Sereni-Massinger the duty to retain her employment over non-tenured faculty.

124.   The duty set forth in the preceding paragraph was a material term of the written agreement and the very essence of the Tenure Track Contract.

125.   In the event it is determined that the written agreement is ambiguous about the scope of Prof. Sereni-Massinger's tenure rights or the permissibility of the University to terminate her for being "associated with" a Center, the University, through a conscious and deliberate act or acts, failed and refused to discharge its contractual responsibilities in good faith, unfairly frustrated the purpose of the written agreement generally, and of tenure in particular, and Prof. Sereni-Massinger's expectation of continued employment with the University.

126. As a result of the University's breach of its implied covenant of good faith and fair dealing, Prof. Sereni-Massinger has been deprived of the benefits of the written agreement and has sustained and incurred, and continues to sustain and incur, damages in an amount in excess of $1,000,000 to be determined at trial.

## COUNT IV

## Promissory Estoppel

127. Plaintiff re-alleges and incorporates paragraphs 1-103 herein as if set forth in their entirety.

128. This is a claim based on Promissory Estoppel.

129. The University induced Prof. Sereni-Massinger to seek tenure, thereby risking her potential for continued employment with the University if she was unsuccessful in achieving tenure, and to confer upon the University the benefits of her extraordinary work performance required to obtain tenure as set forth in paragraphs 33–36 and 44, inclusive, by its representations, statements, promises, assurances, warranties and disclosures that, upon earning tenure:

   a. she would enjoy continued employment until her retirement unless she was terminated for just cause or a reduction in force necessitated by either a man-made or natural disaster, an act of God, a program termination or financial exigency; and

   b. in the event of a reduction in force the University would retain her employment over non-tenured faculty.

130.   Such representations, statements, promises, assurances, warranties and disclosures of the University were made by and through, inter alia, the 2016 Appointment Contract, the Tenure Track Contract, the Tenure Grant, the Faculty Handbook (rev. January 2014), the 2013 CBA, and the University Policy Manual.

131.   The University further induced Prof. Sereni-Massinger to seek tenure, to risk her future employment, and, to confer upon the University the benefits of her extraordinary work performance, all as further described above, by and through its non-disclosure and omission that, according to the University, Prof. Sereni-Massinger's tenure, if granted, would be "associated with" or otherwise limited to the location of her initial appointment (i.e., an Education Center).

132. Based on her reasonable reliance on the University's above representations, statements, promises, assurances, warranties and disclosures, non-disclosures and omissions, Prof. Sereni-Massinger undertook the challenges and risks associated with seeking tenure, and expended extraordinary time, effort, and energy to qualify for tenure, all to the University's great benefit and to her detriment.

133.   It would be unjust for the University to retain the benefits of Prof. Sereni-Massinger's extraordinary labors to achieve tenure, if its promises to:

    a.   maintain her continued employment until her retirement absent either a termination for just cause or a reduction in force necessitated by either a man-made or natural disaster, an act of God, a program termination or financial exigency; and

    b.  retain her employment over non-tenured faculty in the event of a reduction in force,

are not enforced or unless the University compensates Prof. Sereni-Massinger the equivalent value thereof.

134.  As a result of the University's failure to honor its promises, Prof. Sereni-Massinger has sustained and incurred, and continues to sustain and incur, damages in an amount in excess of $1,000,000 to be determined at trial.

## **Relief Requested**

WHEREFORE, Plaintiff, CHRISTINE SERENI-MASSINGER, demands judgment in her favor and against Defendant, SAINT LEO UNIVERSITY INCORPORATED, and seeks relief, as follows:

a.    Declaration that the Defendant's actions were unlawful and any other appropriate declaratory relief;

b.    Reinstatement, recission of the demotion, and any other appropriate equitable relief;

c.    Make whole award for past, ongoing and expected lost wages, benefits, retirement income, social security, tax consequences, medical expenses, for pre- and post-judgment interest, and any other appropriate damages;

d.    Compensatory damages for emotional distress, loss of enjoyment of life, reputational damages;

e.    Punitive damages;

f.    Attorney's fees and costs; and

g.      Any other relief deemed proper and just.

Dated: August 16, 2023

Respectfully submitted,

*/s/ Heidi B. Parker*
Heidi B. Parker
EGAN, LEV & SIWICA, P.A.
PO Box 2231
Orlando, FL 32802-2231
Phone: (407) 422-1400
hparker@eganlev.com

34