## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**CHRISTINE SERENI-MASSINGER,**

 **Plaintiff,**

**v.**       **Case No.: 8:23-cv-01848-SDM-JSS**

**SAINT LEO UNIVERSITY
INCORPORATED,**

 **Defendant.**

_____/

## DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Defendant, Saint Leo University Inc. (the "University"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, moves this Court to dismiss the Complaint and states as follows.

## INTRODUCTION

Plaintiff brings this lawsuit in response to her termination as part of a larger University-wide reduction in force ("RIF") announced in February 2023. The University had faced adverse financial circumstances that necessitated difficult decisions, including closure of most of the University's Learning Centers (smaller remote learning centers which are distinct from the University's main campus). Plaintiff, who was assigned to the Learning Centers at her own request (as will be discussed below) was terminated when the Learning Centers she was assigned to were closed. In her Complaint, however, Plaintiff alleges that she was included in the RIF

in retaliation for a human resources complaint (the "HR Complaint") she filed <u>in 2017</u> (i.e. six years ago!) in violation of Title VII and in breach of a supposed collective bargaining agreement that no longer exists—and, critically, that never applied to Plaintiff in the first instance.

Plaintiff's claims are due to be dismissed, as a matter of law. First, the events underlying the Title VII retaliation claim (an alleged demotion in 2017 followed by a termination in 2023) occurred six years prior to Plaintiff's termination and Plaintiff failed to exhaust her administrative remedies by failing to file a charge of discrimination within 300 days of the alleged demotion which led to her termination. This claim is time barred.

On the merits, Plaintiff's Complaint is devoid of factual allegations connecting her 2017 HR Complaint to the 2023 RIF. Plaintiff's sole allegation as to causation of events 6 years apart is made "upon information and belief" that the University's Vice President of Academic Affairs, Mary Spoto, negotiated Plaintiff's reappointment terms in *2017* with the specific intent she would be included in a RIF *six years later*. This is preposterous on its face. Plaintiff fails to proffer any facts, beyond rank speculation, that she was included in the RIF based on any retaliatory intent. Additionally, Plaintiff's conclusory allegation that her HR Complaint was "causally related" to her termination—which undeniably was also caused by a University-wide RIF—fails the but-for standard she must allege to plead a retaliation claim.

Plaintiff also asserts various State law contract claims arguing that the terms of her Tenure Grant and Appointment Contracts were breached. However, each of these

claims hinge on language contained within a Faculty Collective Bargaining Agreement (the "CBA"), which never applied to Plaintiff. Specifically, Plaintiff attaches the *2013* CBA. However, the 2013 contract was superseded. In addition, the University ceased recognition of the Union in October 2020 (a fact recently affirmed when the NLRB denied unfair labor practice charges filed by faculty in connection with the withdrawal of recognition). Most importantly, by terms of the CBA, Plaintiff was never an eligible member of the bargaining unit at any point, because she was not main campus faculty and thus cannot sue under the CBA.

Plaintiff cites no other contractual obligations allegedly owed to her outside of the CBA (which was never breached). At the time of Plaintiff's termination in 2023, the 2022 Faculty Handbook governed faculty rights. This document is incorporated by explicit reference in Plaintiff's Complaint and Exhibits. This document—which lays out when tenured professors may be let go— does not contain any of the language which forms the basis of Plaintiff's final three counts (language regarding financial exigency and giving preference to tenured professors in a RIF). Therefore, Plaintiff fails to state a claim and her Complaint should be dismissed in its entirety.

Lastly, Plaintiff's State law claims should be dismissed because they are preempted by federal law. Plaintiff's contract claims are based entirely on language within the CBA, which she alleges is incorporated into her employment contracts. The Court will thus be required to interpret the collective bargaining agreement. Any state law claim requiring interpretation of a labor contract is preempted by federal law, and therefore, subject to dismissal.

## Relevant Factual and Procedural Background

On July 2, 2012, Plaintiff was hired as a full time, non-tenure track, Associate Professor of Criminal Justice. In Plaintiff's initial role, she taught undergraduate criminal justice classes at the University's Gainesville, Lake City, and Ocala Learning Centers (the "Learning Centers"). Compl. at ¶ 19. Plaintiff fails to attach her original appointment letter to her Complaint. However, it is incorporated by explicit reference through Exhibit E to her Complaint.[1] Thus, the University has attached Plaintiff's original appointment letter hereto. Def.'s Ex. A.

Plaintiff alleges she was subsequently offered, and accepted, a faculty position in the Graduate Program of Criminal Justice in July 2015 by the Dean of the School of Education and Social Services. Compl. at ¶ 25. According to Plaintiff, by this appointment she became a member of the main campus faculty, asserting that "the graduate Criminal Justice Department program was under the umbrella of the Public Safety Administration on the University's main campus.". Compl. at ¶ 25. However, by Plaintiff's own admission she was never actually located on campus and only taught graduate criminal justice courses online. Compl. at ¶ 70. Plaintiff does not attach any appointment letter or confirmation indicating she was assigned to, and became a member of, the main campus faculty as opposed to a Learning Center faculty.

---

[1] "In reviewing a motion to dismiss, a court may consider, inter alia, (1) documents that are incorporated by reference into the complaint, and (2) documents that, even if not incorporated by reference, the defendant has notice of and that are 'integral' to the complaint.". *Kessler v. City of Key W.*, No. 19-10030-CIV, 2019 U.S. Dist. LEXIS 221875, at *4 (S.D. Fla. Dec. 20, 2019) (internal citations omitted).

On July 8, 2016, Plaintiff was placed on tenure track as an Associate Professor. (the "Tenure Track Appointment"). Compl. Ex. E. On July 28, 2016, Plaintiff received a 12-month appointment as Associate Dean for the School of Education and Social Services (the "Associate Dean Appointment"). Compl. Ex. B.  The Associate Dean Appointment further provides that "[u]pon completion of your administrative services as Associate Dean, you will return to your former role as Associate Professor in the Criminal Justice department and your pay will be adjusted accordingly." *Id*.

Plaintiff alleges that, upon acceptance of this appointment in 2016, she was subject to a hostile work environment at the hands of an *administrative assistant* Toni Winn. Compl. at ¶ 50. Winn supposedly subjected her to discrimination based on sex and religion. Compl. at ¶ 51. The "discrimination" was that Winn once remarked about Plaintiff's hyphenated last name (how that is religious or gender discrimination is anyone's guess), that Winn objected to Plaintiff using the phrase "holiday party" instead of Christmas party, and Winn said she disliked working for women. Cpt. ¶ 51.

Plaintiff alleges that she complained to Dean of the School of Education and Social Services, Susan Kinsella, regarding Winn's behavior and that Kinsella promised to submit the complaint to human resources, but never actually did so. Cpt. ¶¶ 52 – 59. At this time, in July 2017, Plaintiff began to consider resigning her associate dean role and met with University human resources to inquire what her base pay would be if she were to go back to just being an associate professor. Compl. at ¶¶ 58 – 59.

Plaintiff eventually learned her HR complaint was closed and, in November 2017, once again considered resigning the associate dean role. Compl. at ¶¶ 67 – 68.

Plaintiff describes a series of back-and-forth communications between herself and the University, which she frames as a forced resignation of the associate dean role and reassignment to the Learning Centers which she agreed to "under considerable duress." Compl. ¶¶ 66-73. The negotiations over Plaintiff's role and responsibilities upon resigning from the associate dean role took several weeks, and Plaintiff—a lawyer and former judge—admits she objected to and negotiated various terms with the University. *Id.* Indeed, Plaintiff attached one draft of the reappointment letter, which she ultimately rejected and renegotiated. *Id.* ¶ 73 and Compl. Ex. G Because Plaintiff details these negotiations, and as they are central to all of the common law claims asserted by Plaintiff, Defendant has attached copies of the e-mail negotiations between Plaintiff and the University as Ex. B hereto. Ultimately, on December 15, 2017, Plaintiff formally submitted her resignation from the associate dean role after much negotiation with the University (the "Learning Center Reappointment"). Compl. Ex. E; Def's Ex. B. This Learning Center Reappointment confirms that Plaintiff would return to her "faculty appointment **at the Gainesville, Lake City, and Ocala Centers** as Full-Time, Tenured, Associate Professor with the School of Education and Social Services…" pursuant to her original faculty appointment letter dated June 18, 2012. Compl. Ex. E.

Plaintiff's Complaint is silent as to the events between 2017 and the 2023 RIF, when Plaintiff was informed her position (which, as noted in the preceding paragraph, re-appointed her to the Learning Centers) would be eliminated due to closure of many of the Learning Centers. Compl. at ¶ 76. Plaintiff alleges, upon information and belief,

that the University Vice President of Academic Affairs, Mary Spoto, prepared Plaintiff's 2017 Learning Center Reappointment with the specific intent to terminate Plaintiff, in retaliation for the HR Complaint, based on Spoto's supposed knowledge <u>in 2017</u> that the University intended to eventually terminate personnel associated with the Learning Centers <u>in 2023</u>. Compl. at ¶¶ 91 – 97. Plaintiff further alleges that following the RIF, she discovered that her 2017 resignation had been categorized as a disciplinary demotion, as opposed to a voluntary relinquishing of her administrative role. Compl. at ¶ 103. On May 8, 2023, Plaintiff filed her Charge of Discrimination. The Charge is incorporated by reference, Compl. at ¶¶ 14 – 17, and it is attached hereto as Ex. C.[2] Plaintiff's final day of employment was June 30, 2023.

## ARGUMENT AND SUPPORTING MEMORANDUM OF LAW

### I.   Plaintiff's Title VII Retaliation Claim

#### a.  Plaintiff Failed to Properly Exhaust Her Administrative Remedies

Plaintiff's Complaint asserts a few instances of what Plaintiff alleges is discriminatory conduct, all of which occurred from 2016 to 2017. This culminated in Plaintiff's decision to resign from her associate dean role in 2017 under "duress," a supposed "demotion" that led to her eventually being included in the 2023 RIF when the Learning Centers were closed by the University in 2023. Plaintiff concludes that

---

[2] *See Ellison v. Postmaster Gen., United States Postal Serv.*, No. 20-13112, 2022 U.S. App. LEXIS 27555, at *18 (11th Cir. Oct. 3, 2022) (holding court may consider public documents, specifically EEOC records, in motion to dismiss through doctrine of judicial notice, as well as incorporation by reference through language referring to conditions precedent in a Title VII retaliation claim.)

her inclusion in the University's 2023 RIF was somehow motivated by her HR Complaint filed six years prior.

A plaintiff alleging Title VII discrimination must first file a Charge of Discrimination within 300 days of the last act of alleged discrimination if the Plaintiff dual files her Charge of Discrimination with the FCHR. 42 U.S.C. § 2000e-5(e)(1); *see also Bourne v. Sch. Bd.*, 508 F. App'x 907, 909 (11th Cir. 2013). Here, Plaintiff dual filed her Charge of Discrimination with the FCHR and EEOC on May 8, 2023. This would require the alleged discrimination to occur between July 12, 2022 and May 8, 2023. A plaintiff who fails to file a charge within 300 days of the last discriminatory act fails to exhaust her administrative remedies under Title VII. *Bourne*, 508 F. App'x at 909.

In her Charge, Plaintiff lists the last relevant period of discrimination as February 16, 2023, when she was informed that she was included in the University's RIF. Ex. C. However, the entirety of Plaintiff's allegations of supposed sex and religious discrimination, as well as her HR Complaint related to the alleged discrimination, date back to 2017. Compl. ¶¶ 48-50. It was **at that time** that Plaintiff alleges she was first demoted and assigned to the Learning Centers in retaliation (the fact that led to her termination given the reason Plaintiff was included in the RIF was that the Learning Centers all closed). *Id*. ¶¶ 60-75. Indeed, in the Complaint Plaintiff directly alleges "Retaliation – Demotion," followed by 15 paragraphs of the events leading to the supposed retaliation in 2017. Compl. p.16 and ¶¶ 60-75. Plaintiff also asserts that the plan to retaliate which began with her 2017 demotion was intended to lead to her termination in 2023. *Id*. ¶¶ 89-92. Thus, by her own admission, Plaintiff felt

8

she was subjected to the discreet adverse action (the "forced" "demotion" which led to her eventual termination) in late 2017. Compl. at ¶¶ 72, 89-92. The clock for a charge began to run in 2017.

In *Delaware State College v. Ricks*, 449 U.S. 250 (1980), the Supreme Court held that a professor who alleged he was previously denied tenure based on national origin could not use a subsequent non-discriminatory termination to pull in the alleged discriminatory tenure denial which occurred outside the 300-day time bar.  In yet another case, the Supreme Court cited *Ricks* for the principle that, "a time-barred act [could not] justify filing a charge concerning a termination that was not independently discriminatory." *AMTRAK v. Morgan*, 536 U.S. 101, 113 (2002) (citing *Ricks*). Thus, Plaintiff's retaliation claim must be dismissed because it concerns a termination that was based on time-barred acts (an alleged demotion) first taken in 2017.

And, to the extent Plaintiff argues that her retaliation claim is not time barred because she has alleged an ongoing hostile work environment, this argument is unavailing. As *AMTRAK* makes clear, "discrete acts such as termination are easy to identify, and constitute separate unlawful employment practices."  *AMTRAK v. Morgan*, 122 S. Ct. at 2073.  Thus, this argument is unavailing where, as here, there is a discrete act of alleged retaliation.

In any event, Plaintiff's allegations of discrimination would not amount to a hostile work environment in the first instance. Under Title VII, a hostile work environment is defined as "repeated conduct, 'such as discriminatory intimidation, ridicule, and insult'…" *Singleton v. Auburn Univ. Montgomery*, 520 F. App'x 844, 847

9

(11th Cir. 2013). The Plaintiff must prove the "'harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment'" *Singleton*, 526 F.3d at 847. Offensive off-handed comments during casual conversation are not actionable under a theory of hostile work environment.[3] *Id*. Here, at most Plaintiff alleged that Winn made a comment about her surname (which is neither religious nor gender discrimination) and made a total of <u>one</u> religion-related comment (that Plaintiff should have used the word Christmas instead of the more generic and inclusive "holiday party") and <u>one</u> gender-related comment (that Winn, a woman, did not like working for women). As a matter of law, this does not amount to a hostile work environment.[4]

Ultimately, regardless of what she claims to try and get around the 6-year time bar, Plaintiff cannot simultaneously allege that she was forced to resign her associate dean position under duress in retaliation for filing an HR Complaint of discrimination (which left her vulnerable to a termination once she was reassigned to the Learning Centers), but that she was also unaware her rights were violated until she learned the resignation was *internally* categorized by the University as a demotion six years later. This is particularly true when considering, as Plaintiff affirms, she was "an attorney and former Judge…[and] was particularly knowledgeable in the areas of Title VII

---

[3] In the university employment context, the Eleventh Circuit has held that racially derogatory language alone extending over a period of years is "too sporadic and isolated" to establish harassment that was so severe or pervasive as to alter the terms and conditions of employment. *Singleton*, 520 F. App'x at 849.
[4] Even if Plaintiff had alleged a hostile work environment, the allegations of a hostile work environment occurred six years prior to Plaintiff's termination and cannot reasonably be considered "sufficiently related" to the eventual RIF. *See Chambless*, 481 F.3d at 1350.

violations including discriminatory behavior and hostile work environments." Compl. at ¶ 49. Title VII's statute of limitations period begins to run when a plaintiff knew, or reasonably should have known, that she was discriminated against. *Carter v. W. Publ'g Co.*, 225 F.3d 1258, 1265 (11th Cir. 2000) (internal citations omitted). An employee must only be generally aware of her rights, and ignorance of specific legal rights does not toll Title VII's 300-day time bar. *Bradley v. Fla. DOT*, 16 Fla. L. Weekly Fed. D334 (N.D. Fla. November 11, 2002) (internal citations omitted).[5]

### b. Plaintiff Does Not Sufficiently Allege Retaliation

In addition to Plaintiff's claims being time-barred, Plaintiff does not plead sufficient facts to state a claim for retaliation. To establish a *prima facie* case of Title VII retaliation, Plaintiff must show that: "(1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." *Smith v. City of New Smyrna Beach*, 588 F. App'x 965, 981 (11th Cir. 2014). Moreover, Plaintiff must plead that her protected activity was the "but-for" cause of her adverse employment action. *Id.* (citing *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013) (holding "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."). *See also Comcast v. National Association of African-American-Owned Media*, 589 U.S. ___ (2020) (facts supporting but-for causation must be apparent even at motion to dismiss stage).

---

[5] Equitable tolling "'is an extraordinary remedy which should be extended only sparingly'" *Mesidor v. Waste Mgmt.*, 606 F. App'x 934, 936 (11th Cir. 2015) (internal citations omitted).

Under federal pleading rules, a plaintiff must go beyond pleading the "sheer possibility" of unlawful activity by a defendant. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). Instead, the Plaintiff must offer "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Ultimately, to survive a motion to dismiss and state a claim for relief, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007). Based on this standard, Title VII retaliation claims are subject to dismissal where a plaintiff fails to allege facts sufficient to support a reasonable inference that their termination was causally linked to any purported protected activity. *Farrukh*, No. 21-13345, 2022 U.S. App. LEXIS 24737, at *9 (affirming dismissal of Title VII claim where Plaintiff failed to allege facts sufficient to support a reasonable inference that mistreatment was causally linked to protected activity).

Plaintiff's claim fails each prong. First, she did not engage in protected activity. As noted above, at most Plaintiff complained to HR that Winn made one neutral comment (about her surname), one comment *related to* religion, but actually about Plaintiff's *non*-religious practice (calling a party a holiday party instead of a Christmas party), and one comment about Winn, a female administrative assistant, not liking working for other women (a comment by a *subordinate* not directed to Winn working *for Plaintiff* or making any gender-based comment *to Plaintiff*). In short, these complaints were about Winn's interpersonal style, but not about *matters made unlawful*

*under Title VII*.[6] As a result, Plaintiff's complaint to HR (which forms the basis of the retaliation claim) is not protected activity under Title VII's anti-retaliation provision in the first instance.

Second, there was no adverse action. Plaintiff claims her resignation from the associate dean role in 2017 was "under duress" and ultimately was the step leading to her inclusion in the RIF. Compl. ¶¶ 72, 89-91. However, employee resignations are presumed to be voluntary. *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995). The mere fact that the employee faces unpleasant alternatives does not establish duress or coercion because the employee maintains their decision-making power and has a choice whether to resign or fight the unlawful coercion. *Id*. at 1568 (internal citations omitted). Plaintiff even admits in her Complaint that she initially considered the resignation voluntary. *See* Compl. at ¶ 103. And the negotiations attached hereto show clearly that the resignation was bargained for at arms length by a lawyer and former judge. As the RIF-related termination is only an issue if it is linked to the 2017 "demotion," and as that "demotion" was based on Plaintiff's voluntary decision after she was dissatisfied that her internal complaint was closed with no action, there was no actionable adverse action by the University.

Third, and perhaps most obviously and critically, there is no allegation of causation. Plaintiff fails to allege a single <u>fact</u> linking her internal HR Complaint in

---

[6] *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 276 (1st Cir. 2022) (holding Whole Foods discipline of employees for wearing Black Lives Matter masks against dress code was not protected activity under Title VII stating "[e]mployees who seek the protection of Title VII's retaliation provision must allege opposition to *some aspect of their employment* or *the conduct of their employer*.") (emphasis added)

2017 and her termination in 2023. Plaintiff merely alleges, upon information and belief, that Spoto was aware the University was contemplating (in 2017!) closure of the Learning Centers and specifically reassigned Plaintiff to the Learning Centers "with the specific intent to [eventually] terminate her[in the 2023 RIF]…" Compl. at ¶¶ 91-92. Plaintiff's causation allegation is nothing more than rank speculation and, frankly, outrageous. Plaintiff is asking the Court to find it plausible that Spoto predicted the closure of the Learning Centers (for budgetary reasons) six years prior to the RIF ever happening and negotiated Plaintiff's resignation with the specific intent to terminate Plaintiff six years after *Plaintiff* initiated the discussion about her resigning the associate dean role. These fanciful and conclusory allegations made "upon information and belief" are meaningless and should be disregarded. *Smith v. City of Sumiton,* 578 F. App'x 933, 935 n.4 (11th Cir. 2014) ("for purposes of a Rule 12(b)(6) motion to dismiss, we do not have to take as true allegations based merely 'upon information and belief.'"). As the Complaint fails to allege a prima facie claim of retaliation, Count I must be dismissed.

## II.   As to Plaintiff's Contract and Quasi Contract Claims: The CBA Does not Apply and Plaintiff Was Not Covered In the First Instance

Plaintiff bases her final three counts entirely on language contained in the 2013 CBA. However,  the University ceased recognizing the union in October 2020. *See* Ex. D attached hereto, at 5.[7] Specifically, Plaintiff relies on language within the CBA

---

[7] Defendant requests this Court take judicial notice of the NLRB's findings contained in Administrative public record. *See Ellison*, No. 20-13112, 2022 U.S. App. LEXIS 27555, at *18 (noting district courts may consider such documents through judicial notice).

stating, "[t]he rationale for a reduction in force may include man-made and natural disasters, acts of God, program termination or financial exigency." Compl. Ex. D at 37. Plaintiff also cites to CBA language which provides that, in the event of a RIF, tenured faculty will be granted preference over non-tenured faculty. *Id.* at 38. Plaintiff also attaches an outdated 2013 version of the Faculty Handbook. Compl. Ex. F.

In essence, Plaintiff's claim is that she was promised (1) she could only be terminated for serious financial exigency which *she* believes did not exist here; and (2) she claims she should have been saved from the RIF because tenured professors have preference over non tenured professors in a RIF. It follows that if the CBA does not apply, the claims predicated on that inapplicable CBA cannot stand.

As noted, the University ceased recognizing the union in 2020, a decision that was affirmed as lawful by the NLRB because the University, a religious institution, is not covered by the NRLA. Following the University's withdrawal of union recognition, the University and faculty collaborated in preparing a series of revised Faculty Handbooks, which served to govern faculty rights in absence of the CBA. *See* Ex. D at 5. As noted by Plaintiff herself, these handbooks were referenced and incorporated into each faculty appointment letters. *See* Compl. Ex.'s B, E, G and Compl. ¶ 38. The most recent version of the Faculty Handbook was revised in March 2022 (the "2022 Faculty Handbook"). The 2022 Faculty Handbook provides the University much more discretion as to RIF decisions than Plaintiff asserts in Counts II-IV. Specifically, the 2022 Faculty Handbook provides:

> The University may reduce the faculty workforce at any time **as a result of reallocation of resources, reorganizations of degree or curriculum offerings or requirements, adverse financial circumstances, reduction or elimination of programs or functions,** epidemics or pandemics, man-made and natural disasters, or acts of God. **The reduction may be at any organizational level and may impact one or more faculty members, as well as either or both non-tenured or tenured faculty.**

(emphasis added). Ex. E attached hereto, at p.63. Additionally, the 2022 Faculty Handbook does not provide tenured faculty preference over non-tenured faculty. *Id.*

As the 2013 CBA referenced by Plaintiff as the basis for her claims in Counts II-IV no longer applied and were actually superseded by handbook language (that Plaintiff admits was incorporated into her appointment letters) which contradicts her claims, these counts cannot survive.

Moreover, and critically, the terms of the CBA itself exclude Plaintiff as an eligible member of the bargaining unit subject to the CBA's provisions, and, consequently, she cannot sue for its breach. Article 1, Section 1 of the CBA attached to Plaintiff's Complaint provides that the University recognizes the Union as the bargaining agent for "only Faculty employees **actually located at the Saint Leo University Campus in Saint Leo, Florida**." Compl. Ex. D at 6.

Plaintiff's 2017 Reappointment Contract confirms Plaintiff's "**return** to faculty appointment **at the Gainesville, Lake City, and Ocala Centers** as a Full-Time, Tenured, Associate Professor…" Compl. Ex. G. By its terms, Plaintiff was previously assigned to the Leaning Centers and voluntarily _returned_ there when she asked to leave her associate dean role and voluntarily signed the 2017 appointment letter.  Plaintiff

attempts to get around this explicit provision in her own attachments to the Complaint[8] by alleging that she was at some point granted a main campus position through an appointment by the Dean of the School of Education and Social Services. Plaintiff, however, does not attach any documentation of such an appointment, and that supposed appointment would, therefore, not be recognized (if the appointment happened in the first place), as all official appointments must be made in writing by the Vice President of Academic Affairs ("VPAA"). *See* Compl. Ex. F at 34; Def.'s Ex. E at 15. Additionally, by her own admission Plaintiff taught online from 2015 through her termination, and she was not "actually located" at the main campus at any time. Compl. at ¶¶ 70, 72. The only time Plaintiff was ever *associated* with the main campus was as an Associate Dean in 2017, an administrative position excluded from the CBA! Compl. Ex. D at 6. Either way, Plaintiff was not a member of the union and had no rights under the CBA. And, as noted, even if she had been part of the union, any rights under the CBA were extinguished by Plaintiff's voluntary acceptance of a position outside the bargaining unit when she resigned to go to the Learning Centers in 2017.[9]

The ineffectiveness of the CBA, and Plaintiff's exclusion from the bargaining unit, are also evident from Plaintiff's total failure to utilize the grievance procedure in the CBA. For this reason as well, Plaintiff's contract and quasi contract-based claims in Counts II through IV should be dismissed as a matter of law, irrespective of the

---

[8] Something Plaintiff cannot do in the first instance because, as is well-settled, if an exhibit to a complaint contradicts an allegation in the complaint, the exhibit controls.

[9] Indeed, we note that while suing for breach of the CBA and for quasi contract, Plaintiff never actually alleges that she was a member of the union.

merits. *Dweck v. City of Miami Springs*, No. 1:18-cv-23320-KMW, 2020 U.S. Dist. LEXIS 190108, at *11-12 (S.D. Fla. Oct. 14, 2020) (dismissing, for failure to exhaust administrative remedies, breach of contract claim based on CBA language).[10]

## III.    Plaintiff Has Not Alleged a Breach of Contract.

To properly plead a claim for breach of contract, Plaintiff must allege (1) a valid contract, (2) a material breach, and (3) damages. *Havens v. Coast Fla., P.A.*, 117 So. 3d 1179, 1181 (Fla. 2d DCA 2013). Plaintiff cites no agreement, aside from the CBA, containing the language that forms the basis for her two additional theories of breach of contract. As noted, the CBA does not apply. Under the appointment letter, however, the Faculty Handbook clearly did apply. Compl. ¶ 39.  Contrary to the allegations in Count II relating to the CBA, the 2022 Faculty Handbook provides multiple additional justifications for the implementation of a RIF, including "adverse financial circumstances" and "reduction or elimination of programs or functions."  Moreover, the Faculty Handbook specifically excludes terminations related to a RIF from its grievance procedures. Ex. E at p.59. The Faculty Handbook also does not contain any obligation to grant preference to tenured faculty in the event of a RIF, and specifically notes a RIF may include tenured and non-tenured faculty. These provisions, which Plaintiff admits apply as the Faculty Handbook was incorporated in the appointment letter, directly contradict Plaintiff's claims that she was not able to be terminated in a RIF or that she was entitled to preference as a tenured professor.

---

[10] The lone exception to this requirement applies where an employee can show that the Union did not adequately represent the employee during the grievance process. *Cox v. Johnson Controls Battery Grp.*, 11 Fla. L. Weekly Fed. D347 (M.D. Fla. November 17, 1997). This was not alleged.

Notably, even examining the Plaintiff's claims in relation to the inapplicable CBA Plaintiff attached, Plaintiff's contract and quasi contract claims *still* fail because she has not alleged a material breach. Specifically, Plaintiff alleges her termination was improper because the University's RIF was based on "forecasting future market needs" and "future success." Compl. at ¶¶ 83, 85. However, the CBA begins its language regarding a reduction in force by stating "[s]hould **the University foresee** the need for a reduction in force." Compl. Ex. D. The CBA <u>clearly</u> contemplates the need for a RIF based on future financial forecasting, i.e. permitting exactly what Plaintiff claims is prohibited. It is also illogical that the University would wait to take preventative action until future foreseeable financial problems actually manifest themselves, instead of taking actions to prevent the harm from occurring in the first instance.

Similarly, Plaintiff alleges the University's RIF justification constituted a breach because *her* program, the Masters in Criminal Justice Program, was not terminated. Compl. at ¶ 84. However, the elimination of most of the Learning Centers *as a whole* was justification for the RIF. Indeed, Plaintiff *admits* this *was* the reason the University provided for her inclusion in the RIF. *See* Compl. at ¶ 84. While Plaintiff may not have *agreed* with the decision, this does not mean the RIF constituted a breach of contract.

Finally, the University did not breach the CBA by terminating a tenured faculty member as part of the RIF, as Plaintiff suggests. The CBA attached to the Complaint does not impose an absolute duty upon the University to retain tenured faculty during a RIF. Instead, the CBA provides: "Tenured faculty will be granted preference in retention over non-tenured faculty **if the tenured faculty member's qualifications are**

**judged by the University to be more aligned with program needs.**" Thus, the CBA provided the University with flexibility based on its judgment of as to which faculty members had to be retained to more closely align with program needs. And, based on this discretion, the University was permitted to select tenured faculty as well in a RIF if it felt this was justified. Plaintiff has not alleged how this provision was breached.

In closing, even if the CBA applies, which it does not, Plaintiff failed to state a claim for breach of contract under the plain language of the documents and policies attached to and otherwise referenced in the Complaint.

## IV.   Plaintiff Has Not Alleged a Breach of the Implied Covenant of Good Faith and Fair Dealing

In the context of this implied duty, good faith is defined as "honesty, in fact, in the conduct of contractual relations." *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999) (internal citations omitted). This implied covenant is designed to protect the parties' reasonable expectations of the parties in light of their express agreement. *QBE*, 94 So. 3d at 548 (internal citations omitted). Plaintiff has not alleged a breach of this duty.

First, the University did not participate in misconduct amounting to dishonesty in the negotiations of its employment contracts with Plaintiff. Plaintiff alleges, upon information and belief, that Mary Spoto knew in late 2017 that the University was contemplating closure of the Learning Centers and attempted to associate Plaintiff with the Learning Centers with the specific intent to terminate her *six years later*. *See* Compl. at ¶ 97. Plaintiff offers no support for her near frivolous and wholly

manufactured contention that the University acted in bad faith in negotiating her contract. Additionally, Plaintiff admits she was a lawyer and former judge who quite directly negotiated her own return to the centers, including rejecting and renegotiating the terms of the initial draft of the 2017 agreement. Compl. ¶¶ 62-75, 89-91.

Moreover, and critically, the background negotiation documents, referenced in the complaint but not actually attached by Plaintiff (but attached hereto as Ex. B) show undeniably that Plaintiff had a truly arm's length transaction, negotiating—and successfully modifying in certain instances—the material terms of the agreement. Given the arms-length transaction, and the 6 year separation between the negotiation of the 2017 agreement and the imposition of the RIF (and the implicitly admitted financial exigency leading to the total closure of many Learning Centers), there are no facts to suggest any act of dishonesty by the University to support a claim of bad faith.

Additionally, as a matter of law, a claim for breach of the implied covenant of good faith and fair dealing cannot stand where: (1) where application of the covenant would contravene the express terms of the agreement; and (2) where there is no accompanying action for breach of an express term of the agreement. *QBE*, 94 So. 3d at 548 (internal citations omitted). Both problems exist here.

First, the Faculty Handbook does not contain the provisions on which Plaintiff bases her claim, and actually contains terms *contrary to* the CBA terms on which Plaintiff bases her claim. Second, as also discussed previously, Plaintiff has not alleged a breach of any agreement or specific promise by the University. As discussed in the preceding section, Plaintiff cannot identify an express term of the CBA which applied

and which the University breached.  Where a Plaintiff asserts a claim for breach of the implied duty of good faith and fair dealing, but does not cite to a specific term of the contract that was breached or that the defendant never intended to honor, the breach of duty of good faith claim fails as a matter of law. *Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 896 So. 2d 787, 792 (Fla. 2d DCA 2005).

Because Plaintiff cannot identify an express term of a contract applicable to Plaintiff that the University breached, and because her claim would require the Court to ignore the terms of the Faculty Handbook referenced in the 2017 agreement, Plaintiff's claim in Count III should be dismissed.

## V.    Plaintiff's Promissory Estoppel Count is Legally Insufficient as Plead

To state a cause of action for promissory estoppel, a plaintiff must establish: (1) a representation as to a material fact that is contrary to a later-asserted position; (2) a reasonable reliance on that representation; and (3) a change in position detrimental to the party claiming estoppel caused by the representation and reliance thereon. *FCCI Ins. Co. v. Cayce's Excavation, Inc.*, 901 So. 2d 248, 251 (Fla. 2d DCA 2005). Additionally, "[a]s a threshold matter, the law is clear that 'promissory estoppel is not available as a remedy when the parties have a written contract addressing the relevant issues.'" *Mangravite v. Univ. of Miami*, 838 F. Supp. 2d 1326, 1333 (S.D. Fla. 2011) (internal citations omitted). Plaintiff does not plead her promissory estoppel count in the alternative to her breach of contract count. And, even if she did try and plead in the alternative, Plaintiff affirmatively alleges the existence of a contract at law and incorporates such contract by reference (the ultimate version of which is attached

hereto by Defendant). Because the Tenure Grant and Appointment Contracts, along with the incorporated policies, govern the dispute, the estoppel claim is barred as a matter of law. *See Mangravite*, 838 F. Supp. 2d at 1333 (granting summary judgment and holding that promissory estoppel was not available as a matter of law where annual contracts and Faculty Manual governed dispute over denial of tenure).

Moreover, Promissory estoppel only applies if the promisor makes a promise "which he should reasonably expect" to cause the promisee either to take some action or forego taking action. *White Holding*, 423 F. App'x at 947. Plaintiff cannot point to any promise by the University that tenured professors would be granted absolute immunity, or even absolute preference, in the event of a RIF. The 2022 Faculty Handbook clearly outlines that it may impact "both non-tenured and tenured faculty." And even the CBA on which Plaintiff bases her Complaint, explicitly provides that tenured faculty may be terminated through a RIF. *See* Compl. Exhibit D at p.36. Nor, as discussed above, did the University promise that Plaintiff would be granted absolute preference over non-tenured faculty in the event of a RIF. *Id.* at p.38.

Plaintiff implies that if she had known she could be included in a RIF, she would not have sought tenure due to the risks if she had not achieved tenure. This is irrelevant. First, if Plaintiff was unclear about when and if tenured professors could be terminated, she could have sought clarity before working to obtain tenure. She does not allege <u>the University</u> said or did anything to cause her to believe she could never be subject to a RIF. To the contrary, Plaintiff admits the University referred to documents in its appointment letters that specifically referenced a RIF <u>could</u> affect

tenured professors. As a former judge, Plaintiff should have understood as much. Second, Plaintiff was not terminated for failing to achieve tenure, so her argument is unavailing in the first instance. Finally, and critically, Plaintiff's argument for estoppel is illogical when viewed in conjunction with her admission that tenured faculty were owed preference over non-tenured faculty. If it were true that Plaintiff would not have sought tenure if she knew they could sometimes be included in a RIF, Plaintiff would be at an even *greater risk* of being terminated through a RIF because she would be non-tenured and entitled to even less protection. In other words, Plaintiff's suggestion that she would never have sought tenure—and would have put herself in an even worse position with respect to a RIF—if she knew tenured professors could sometimes be subject to a RIF, defies logic. As Plaintiff, a lawyer and judge, does not allege any facts to suggest the University misled her or caused her to take any action she would not have taken otherwise in seeking tenure, her estoppel claim should be dismissed.

## VI.   Plaintiff's State Law Contract Claims are Preempted by Federal Law

Section 301 of the Labor Management Relations Act (LMRA) grants jurisdiction to the federal district courts to interpret and enforce the terms of labor contracts. *See* 29 U.S.C. § 185(a). Additionally, where the alleged breach of a collective bargaining agreement is at issue, federal law preempts state law. *Roberts v. Walt Disney World Co.*, 908 F. Supp. 913, 916 (M.D. Fla. 1995) ("a breach of contract claim…for violation of the collective bargaining agreement, cannot be brought under Florida contract law and must be brought under section 301.").

In examining whether Plaintiff's state law claims are preempted, the court must determine whether the elements require interpretation of the CBA. *Hayduk v. UPS*, 930 F. Supp. 584, 597 (S.D. Fla. 1996) (internal citations omitted). "When a court determines that a state law claim is preempted…, it has the discretion to either: (1) convert it into a Section 301 claim…or (2) dismiss it as preempted." *Dweck*, No. 1:18-cv-23320-KMW, 2020 U.S. Dist. LEXIS 190108, at *8-9. Here, Defendant asserts the CBA does not apply (and the contract and quasi contract claims based on the CBA must therefore be dismissed). But if the CBA does apply (as Plaintiff repeatedly asserts), it preempts the three common law claims. Either way, and among the many others discussed above, Counts II, III, and IV must be dismissed in their entirety.

## VII.   Conclusion

Plaintiff's Complaint is legally insufficient and should be dismissed. Plaintiff's Title VII claim is entirely based on time barred allegations of supposed retaliation, linked to a voluntary position transfer Plaintiff negotiated at arms-length over six years prior to Plaintiff's termination. Plaintiff also fails to plead any element of a prima facie case of retaliation. Additionally, Plaintiff's common law claims fail because they are based on inapplicable documents, inconsistent with the language contained in those documents, as well as the documents in effect at the time of her termination. Finally, to the extent the CBA governed Plaintiff's rights, which it does not, Plaintiff's common law claims would be preempted by federal law.

WHEREFORE, the Defendant, SAINT LEO UNIVERSITY INCORPORATED, respectfully requests entry of an Order dismissing the Complaint

in its entirety, awarding Defendant its attorneys' fees for defending against these baseless claims, and award such further relief deemed just and proper.

Respectfully Submitted,

JACKSON LEWIS P.C.

/s/ Mendy Halberstam
Mendy Halberstam, Esq.
Florida Bar No. 68999
mendy.halberstam@jacksonlewis.com
JACKSON LEWIS P.C.
One Biscayne Tower, Suite 3500
Two South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 577-7600


and


Michael J. DeMaio, Esq.
Florida Bar No. 1019194
michael.demaio@jacksonlewis.com
nichole.villa@jacksonlewis.com
tampadocketing@jacksonlewis.com
Wells Fargo Center
100 South Ashley Drive, Suite 2200
Tampa, Florida 33602
Tel:  (813) 512-3210
*Attorneys for Defendant*

## **LOCAL RULE 3.01 CERTIFICATE OF GOOD FAITH CONFERRAL**

Defendant certifies that on October 19, 2023, Defendant's counsel, Mendy Halberstam and Michael DeMaio, conferred with Plaintiff's counsel, Heidi Parker, via e-mail regarding the issues discussed in this Motion and Defendant's intent to file if Plaintiff did not withdraw her claims. Plaintiff's counsel has failed to respond by the close of business on October 20, 2023, and thus, is assumed to oppose this Motion.

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of October, 2023, a true and correct copy of the foregoing was filed with the Clerk of the Court via CM/ECF, which will provide an electronic copy to all counsel of record:

Heidi B. Parker
EGAN, LEV & SIWICA, P.A.
PO Box 2231
Orlando, FL 32802-2231
T: 407-422-1400
hparker@eganlev.com

*Attorneys for Plaintiff*

/s/ *Mendy Halberstam*
Attorney

4873-3739-5841, v. 7

27